United States Courts
Southern District of Texas
F I L E D

AUG 0 9 2022

Nathan Ochsner, Clerk of Court

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### HOUSTON DIVISION

| | | |
|---|---|---|
| THOMAS BROWN, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| FORD MOTOR COMPANY, and | § | |
| RUSSELL AND SMITH FORD, and | § | |
| MICHAEL G. SMITH, | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Thomas Brown, Plaintiff *pro-se* whom alleges against Defendant Ford Motor Company, Defendant Russell and Smith Ford, and Defendant Michael G. Smith violations of the Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann.§ 17.41, et seq. (DTPA), asserting that Defendants have engaged in false, misleading, or deceptive acts or practices in the conduct of trade and commerce in violation of the DTPA.

Defendant Michael G. Smith is the Chief Executive Officer of Defendant Russell and Smith Ford dealership in Houston, Texas, and is an owner of this Texas Corporation. Plaintiff seeks damages from Defendant Smith in both his individual capacity and his official capacity as owner of this business and C.E.O. of Defendant Russell and Smith Ford.

Plaintiff seeks a declaratory judgement against Defendants for violations of the provisions of the DTPA, and compensation for damages. Plaintiff further seeks reasonable

attorney's fees and costs for prosecuting this action at the point when counsel is retained to represent Plaintiff.

## DISCOVERY

Plaintiff intends to conduct discovery under Level 3 of the T.R.C.P., 190.4, and affirmatively pleads this suit is not governed by the expedited-actions process in T.R.C.P., 169 because Plaintiff seeks momentary relief over $100,000.

## RELIEF

Plaintiff seeks monetary relief over $250,000 but not exceeding $1,000,000.

## JURISDICTION AND VENE

This Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332, as Plaintiff and Defendant Ford Motor Company reside in different states and the amount in controversy exceeds $75,000, excluding interest and costs. Venue lies in Harris County, Texas because each of the Defendants are doing business in Harris County, Texas, and this is the physical location where Plaintiff purchased the Ford F250 pickup truck the subject of this suit.

## PARTIES

### PLAINTIFF THOMAS BROWN

Plaintiff Thomas Brown is, and at all times relevant hereto, was a resident of the State of Texas. Plaintiff may be served at the following address:

> Thomas Brown
> 11715 Forest Wind Trail
> Houston, TX. 77066
> thomaslenbrown@gmail.com
> 281-235-4131

### DEFENDANT FORD MOTOR COMPANY

Defendant Ford Motor Company, is a corporation doing business in the State of Texas

with a world headquarters located at:

> Ford Motor Company
> 1 American Road
> Ford World Headquarters Room 612
> Dearborn, MI. 48126

For service of process, Defendant's registered agent may be served at :

> CT Corp System
> 1999 Bryan Se., Ste. 900
> Dallas, Texas 75201-3136

## DEFENDANT RUSSELL AND SMITH FORD

Defendant Russell and Smith Ford, is a corporation doing business in the State of Texas

and located at:

> Russell and Smith Ford
> 3440 South Loop West
> Houston, TX. 77025

For service of process, Defendant's registered agent may be served at :

> Michael G. Smith
> Russell and Smith Ford
> 3440 South Loop West
> Houston, TX. 77025

## DEFENDANT MICHAEL G. SMITH

Defendant Michael G. Smith, is an individual doing business in the State of Texas and

may be served at :

> Michael G. Smith
> Russell and Smith Ford
> 3440 South Loop West
> Houston, TX. 77025

## STATEMENT OF FACTS

1/      On June 9, 2020, Plaintiff purchased a vehicle from Defendant Russell and Smith Ford,

namely, a 2020 Ford F250 model truck, VIN# 1FT7W2BT0LEC69722 at a cost of $68,386.26,

and;

2/      That the truck Plaintiff purchased from Defendant Ford is a higher-end version of this

vehicle, namely a diesel, 4x4 Lariat model of the F250 truck, and;

3/      That Plaintiff purchased this truck because it was marketed as a heavy duty, dependable

truck, and;

4/      That on July 13, 2022 Plaintiff went to Defendant Russel and Smith's Ford dealership to

request a copy of the service records for Plaintiff's vehicle, and;

5/      That Plaintiff was provided with a stack of pfd documents totaling 45 pages (Exhibit A,

Vehicle Service Records, 45 pages), and;

6/      That the service records provided for all service dates before January of 2022 did not

have the dates of service, and were missing other pieces of information, and;

7/      That Defendant Ford's Service Manager Kamron McNulty advised Plaintiff that the

complete historical service data for the truck in question is no longer available because

Defendant Ford changed their computer system, and all historical service data did not transfer

over to the new system (Exhibit B, Email from Defendant Ford's Agent McNulty, 4 pages), and;

8/      That Agent McNulty advised Plaintiff the records found in Exhibit A were all of the

service records available, and;

9/      That without a detailed set of service records for the truck in question, Plaintiff is

prevented from creating an accurate chronological timeline for the incidents and problems as

outlined in this statement of facts, and;

10/      That Plaintiff intends to amend the pleadings when the facts are discovered in the course

of this litigation, and;

11/      That the vehicle in question come stock with running boards on each side of the vehicle,

and;

12/      That these running boards are steps a person would use to climb into the vehicle, and;

13/      That each running board on the vehicle in question has 28 narrow plastic detachable trim

pieces inset into the running boards on each side of Plaintiff's truck, and;

14/      That the truck has a total of 56 trim pieces on running boards on Plaintiffs truck, and;

15/      That the 28 narrow plastic trim pieces running along each running board comprise the

walking surface of the running board that a person would step onto to get into the truck, and;

16/      That each running board also has an end cap made of plastic with one on each end of the

running board, for a total of four on the truck in question, and;

17/      That these trim pieces are somewhat easily detached, and;

18/      That within a couple of months of buying this vehicle, these plastic parts on the exterior

of the vehicle began falling off, and;

19/      That at present, Plaintiff's vehicle has numerous missing pieces of these plastic trim parts

on the truck (Exhibit C, Photo of Drivers-Side Running Board, 1 page, July 25, 2022), and;

20/      That Defendants conveniently make these plastic parts as easy to replace as they fall off,

for a corresponding fee, and;

**Brown v. Ford et al.**                                                          **Page 6 of 35**

21/     That each of the 56 plastic trim pieces cost $31.56 to purchase for a total of $1,767.36 not including sales tax for the replacement cost of the running board step-on plastic trim pieces on Plaintiff's truck, and;

22/     That each plastic end cap costs 55.80 to purchase, for a total of $223.20 not including sales tax for the cost of the plastic end cap covers on this truck, and;

23/     That there would be an additional fee for a Ford technician to install these trim pieces, and;

24/     That Plaintiff's truck comes with a tailgate for the bed of the truck, and;

25/     That a large square button is visible centered in the tailgate cover, and;

26/     That when the trucks tailgate is in the folded-down or extend outward position, and this button is pressed, it releases a set of brackets that pop out of the tailgate and fold down, creating a step that is used to step up into the trucked, and;

27/     That this pop-out step system has a plastic cover over it which is recessed into the tailgate, and;

28/     That this plastic "cover" caps the tailgate when the tailgate is closed, and;

29/     That this plastic tailgate cover or lid is less than 1/8th inch thick in places, and;

30/     That when the tailgate is lowered down from it's upright position, with the step extended down for a person to use as a step up onto the tailgate to get into the truck bed, that person typically place their foot on the vertical lip of this thin plastic cover as they step up into the truck bed, and;

31/     That within just a few times of using this tailgate step, and stepping onto the plastic lip or edge of this cover as Plaintiff stepped up into the truck bed, the plastic cover started popping out

and away from the tailgate, damaging the little plastic lugs that hold this plastic cover to the

tailgate, and;

32/      That as of the filing of this suit, this step assembly will not release from the tailgate, the

thin plastic cover is damaged, falling off, and will not stay attached as designed (Exhibit D,

Tailgate Step Cover, 1 photo, 07-25-22), and;

33/      That at one point, the front-end brakes on the truck failed and the truck had to be left at

the dealership so the front-end brake components could be replaced, and;

34/      That the truck the subject of this suit has an all-in-one, in-dash entertainment/navigation/

internet connectivity/truck-systems control panel, and;

35/      That various functions which are all managed within this control panel has had a series of

ongoing problems forcing Plaintiff to repeatedly leave the vehicle at Defendant's Russel and

Smith Ford dealership for repairs, and;

36/      That the truck's in-dash system has had 7 different instances where it was documented by

Defendant Ford and Defendant Smith that the electronics system needed technical repair of some

sort to make it functional and operational, and;

37/      That there were other occasions where the electronics were malfunctioning periodically

and when the truck was at the dealership the issue was not manifesting itself, and in those

occasions, the issue were not logged into Defendant Ford's data system, and;

38/      That when the truck had 9,202 miles, it was went in for service due to problems with the

electronics in the truck not working correctly (Exhibit A, Vehicle Service Records, 45 pages, at

page 7), and;

39/      That various components in the electronics were reprogrammed or repaired, and;

40/    That the service records do not indicate what the specific problems were, and;

41/    That when the truck had 14,023 miles, it was went in for service due to problems with the electronics in the truck not working correctly, specifically the speakers sounding as if they were blown (Exhibit A, Vehicle Service Records, 45 pages, at page 15), and;

42/    That the service records indicate Defendant Ford was unable to duplicate this problem, and;

43/    That on or about May 24, 2022, Plaintiff served Defendants with a Deceptive Trade Practices Act violation notice (See Exhibit E, D.T.P.A., Notice of Claim by Thomas Brown, 5 pages), and;

44/    That Plaintiff hereby incorporates Exhibit E, Notice of Claim by Thomas Brown, 3 pages as if set forth in full at this point, and;

45/    That Plaintiff had approximately 26,000 miles on the vehicle at the time Defendants were served with this notice, and;

46/    That when the truck had 27,433 miles, it was went in for service due to problems with the electronics in the truck not working correctly, specifically the navigation system not functioning correctly (Exhibit A, Vehicle Service Records, 45 pages, at page 23), and;

47/    That the service records indicate Defendant Ford reset the system or performed some other repair, and;

48/    That when the truck had 36,163 miles, it was went in for service due to problems with the electronics in the truck not working correctly, specifically the 4G wifi hot spot system not functioning correctly (Exhibit A, Vehicle Service Records, 45 pages, at page 28), and;

49/    That Plaintiff pays a monthly fee for this extra, 4G cellular service in the truck, and;

**Brown v. Ford et al.**                                                                                      **Page 9 of 35**

50/    That the service records indicate Defendant Ford repaired the system at Plaintiff's expense, and;

51/    That Plaintiff contacted Defendant Ford about this issue complaining that the truck is being dropped off of service, and the electronic problems are never fixed (See Exhibit F, Email to Defendant Ford, 3 pages), and;

52/    That when the truck had 39,605 miles, it was went in for service due to problems with the electronics in the truck not working correctly, specifically the radio would not turn on and off and was not functioning correctly (Exhibit A, Vehicle Service Records, 45 pages, at page 30), and;

53/    That the service records indicate Defendant Ford repaired the system at Plaintiff's expense, and;

54/    That when the truck had 39,711 miles, it was went in for service due to problems with the electronics in the truck not working correctly, specifically the radio would not turn on and off and was not functioning correctly (Exhibit A, Vehicle Service Records, 45 pages, at page 36), and;

55/    That the service records indicate the trucks electronics would not function correctly, and;

56/    That the service records indicate Defendant Ford repaired the system at Plaintiff's expense, and;

57/    That during time frame that followed that date the D.T.P.A. notice was served, Plaintiff determined that the head of the service department was Shane Worsham, the Director of Service at Defendant Russell and Smith Ford dealership, and;

58/     That Defendant's Agent Worsham's office was about 20 feet from the service deck where

Plaintiff would go when checking in his vehicle of service, and;

59/     That it reached a point where each time Plaintiff brought the vehicle to the dealership for

repair, Plaintiff began to complain directly to Agent Worsham about the fact that the vehicle

continued to be brought to the dealership with complaints about the electrons system not

functioning correctly, and;

60/     That at one point, Plaintiff went to Agent Worsham's office to complain about the

electronics again not being fixed, and Agent Worsham blurted out, with obvious frustration, "We

just can't fix these", and;

61/     That Plaintiff responded, asking what he was supposed to do, and;

62/     That Agent Worsham advised Plaintiff that they would continue to try and figure out what

the problem was, and might have to get Ford engineers involved, and;

63/     That on one of the times Plaintiff brought the truck back to the dealership due to

problems with the entertainment/navigation system, Defendant Ford's check-in dealership

service representative Brandon Bailey advised he couldn't check in the vehicle as there was a

hold in place, and;

64/     That Plaintiff was escorted to Agent Worsham's office, and;

65/     That Plaintiff asked Agent Worsham why there was a hold the truck being serviced, and;

66/     That Agent Worshman advised Plaintiff that he had to check in his system to see if there

was any ongoing litigation as they would not be able to work on Plaintiff's truck if a suit had

been filed, and;

67/     That Agent Worshman kept Plaintiff standing there for a short period of time while he was looking at his computer screen supposedly in an effort to verify that no lawsuit had been filed, and;

68/     That Plaintiff stood there without making any comment, and;

69/     That after a short period of time, Agent Worsham advised Plaintiff that he didn't see any suit had been filed, and;

70/     That Plaintiff responded to Agent Worsham that he knew Plaintiff had not filed any suit, and;

71/     That Agent Worsham responded, "We don't care if you sue us. Ford indemnifies us," and he shrugged stating, "It doesn't matter", and;

72/     That Agent Worsham then advised Plaintiff again that once a suit was filed, they would no longer be able to service Plaintiff's vehicle, and;

73/     That the last time the vehicle was at the Defendant Russel and Smith Ford dealership over the ongoing electronics problem, it was there more than a week, and;

74/     That at one point, Plaintiff advised Defendant's Agent Bailey that he didn't care if the system didn't work as he needed the vehicle back for work, and Agent Bailey refused to return the vehicle, stating that Ford engineers needed the vehicle at the dealership so they could trouble shoot the problems, and;

75/     That Plaintiff was advised the dealership was working with Ford engineers trying to determine why the system kept malfunctioning (See Exhibit G, Email from Defendant Ford, 2 pages), and;

76/     That the built-in, in-dash entertainment navigation system in the vehicle the subject of this suit has a built-in 4G hotspot that can be connected to AT&T for a monthly cellular service fee, and;

77/     That the hotspot is a device used to connect directly to the internet via a cellular service plan, and;

78/     That leading up to the pointing time when Defendant Russell and Smith Ford had Plaintiff's vehicle and would not return it at Plaintiff's request, the 4G hotspot in the vehicle worked periodically, and;

79/     That during this time Plaintiff used the hotspot periodically, and based on this use, had a sense of how the hotspot would function in relation to the flow of data that Plaintiff was able to get when connected to the system to access the internet, and;

80/     That on or about November 5, 2021, Plaintiff picked up the vehicle in question after Agent Bailey had advised Plaintiff that Ford engineers were working to fix Plaintiff's vehicle, and;

81/     That after Plaintiff picked up there vehicle Plaintiff noticed the 4G hotspot did not function the same way it had previously, and;

82/     That the hotspot will only carry a very minimal data load if any data at all, and;

83/     That the system does not function as a 4G internet hot spot that was originally marketed to Plaintiff as one of the services this vehicle would be able to provide, and;

84/     That Plaintiff is unable to access the internet for anything via this hotspot and for this reason, on August 2,2022, turned the system off in the truck, and;

85/     That Plaintiff would assert that Defendant Company engineers in concert with Defendant Ford have done some type of modification on the electronics in Plaintiff's vehicle to make it functional; in effect jury-rigging it so it will function, and;

86/     That  the 4G system does not have the data transfer rate performance the vehicle's hot spot should have as a 4G system, and;

87/     That when Plaintiff picked up the vehicle on November 5, 2021, Plaintiff was forced to pay for repair to the vehicles electronic navigation system in order to be able to pick up the vehicle because Defendant Ford's Agent Bailey advised Plaintiff that the bumper-to-bumper warranty base factory warranty had expired, and;

88/     That Plaintiff advised Agent Bailey that he had been complaining about this system not functioning correctly for a very long time, and;

89/     That Agent Bailey responded that the bumper to bumper warranty was expired, and Plaintiff would have to pay for the repair in order to pick up the truck, and;

90/     That after purchasing this vehicle, Plaintiff had a relatively minor traffic accident and suffered damage to the right side of the vehicle by the passenger door, and;

91/     That Plaintiff took the truck to be repaired at Defendant Ford's dealership and the truck set there for weeks, and;

92/     That Plaintiff was advised this was due to the unavailability of replacement parts (See Exhibit H, Email from Triple AAA Insurance Claims Adjuster, 2 pages), and;

93/     That Plaintiff had roadway damage to the front bumper area of this vehicle damaging a wind cowling and a fog light cowl or light housing, and was advised that replacement parts were not available, and;

94/ That Plaintiff was forced to drive this new vehicle for an extended period of time with the front bumper missing parts because the replacement parts were not available (See Exhibit I, Email from Agent of Defendant Ford, 6 pages), and;

95/ That this process where a part would be needed to repair Plaintiffs truck would not the available was repeated when Plaintiff had damaged the bumper and at various other times when the vehicle was in for repair, and;

96/ That shortly after purchasing the vehicle, Plaintiff advised an agent of Defendant Ford and Smith that the transmission transmission in the truck was not shifting correctly, and making mechanical, grinding noises as if it was self destructing, and;

97/ That Plaintiff was advised there is nothing that can be done about this if the problem does not manifest itself when the vehicle is checked, and;

98/ That on March 07, 2022, the transmission failed in this vehicle and;

99/ That the vehicle was towed to the Defendant Ford's Dealership where the vehicle was purchased so it could be repaired, and;

100/ That Defendant Ford's Agent Bailey initially advised Plaintiff there would be a four to six week delay before Plaintiff's vehicle could even be examined to determine what the problem was, and;

101/ That Plaintiff was advised there was a backlog of vehicles needing transmission repairs, and;

102/ That when the six-week period rolled around and Plaintiff inquired as to the repair status of the repair, he was advised by Agent Bailey that it would be a few more weeks until the transmission could be examined, and;

103/   That Plaintiff asked Agent Bailey to confirm whether or not the transmission had been

examined yet, and Agent Bailey confined the vehicle was still waiting in line to be examined  to

determine why the transmission had failed, and;

104/   That after a period of more than two months, Plaintiff was advised that the transmission

had been checked and it was determined would need to be repaired however, that parts were not

available, and that it was not known when the parts would be available, and;

105/   That Defendants eventually just placed a new transmission in Plaintiff's truck, and;

106/   That the vehicle was returned to plaintiff on 05-25-2022 after a 79 day repair period, and;

107/   That during the month of May, 2022 when Plaintiff's vehicle was at Defendant Ford's

dealership still waiting in line for the transmission repair, Defendant Ford Motor Company

issued a safety recall of the vehicle in question, and;

108/   That the recall is identified as "Safety Recall Notice 22S22 / NHTSA Recall 22V256"

which is related to the transmission in the truck, and;

109/   That when Plaintiff picked up the truck on 05-25-2022, the recall had just been issued by

Defendant Ford, and;

110/   That during the check-out process when Plaintiff was picking up the truck after the

transmission had been repaired, Plaintiff asked Defendant Ford's Agent Bailey if the dealership

had been able to do the recall required repairs on the transmission that had just been installed,

and;

111/   That Agent Bailey advised that the parts that were needed to correct the transmission per

the recall were not available as the recall had just been issued, and it was unknown when the

parts required for the recall repair would be available, and;

112/   That when Plaintiff picked up the vehicle, he was given a service ticket receipt that contained the following statement:

> RECALL Customer Notification: Customer has been
> notified that there is a pending recall on their vehicle.
> Customer is unable to have the recall performed at this
> time. Customer will reschedule to have the recall
> completed.
> 994117 SUASTE, CARLOS LIC#: 002428980

> **Exhibit E, Service Ticket dated May 25, 2022, page 6 of 7 pages**
> **See also, Exhibit A beginning at page 38**

113/   That Plaintiff asked the service adviser why the receipt stated incorrectly that Plaintiff was unable to have the repairs completed, and;

114/   That the service adviser responded that he didn't know, and the parts were not available anyway, and;

115/   That Plaintiff is a hearing impaired person using various electronic devices to assist with his ability to communicate, and;

116/   That Plaintiff hears sound with his left ear when it is well over 100 decibels, and;

117/   That Plaintiff has somewhat better hearing with his right ear, with hearing loss at around 70 decibels, and;

118/   That Plaintiff uses various assisted listening devices to help him hear and communicate, and;

119/   That Plaintiff wears an hearing aid in his right ear, and;

120/   That Plaintiff wears a hearing aid microphone in his left ear that picks up sound on his left side and transmits it to the hearing aid Plaintiff wears in his right tear, and;

121/ That Plaintiff's hearing aid has three specific programs, and;

122/ That Plaintiff can use either of these three "programs" depending on the sound

environment Plaintiff is in, and;

123/ That by depressing a small button, or switch on Plaintiff's right hearing aid the device

will cycle through the three available programs, and;

124/ That each depression of the switch will send the hearing aid to the next program, with the

third subsequent depression of the switch returning the hearing aid to the main hearing program,

or Program 1, and;

125/ That program 1 could be described as a program to be used in a normal sound

environment, and;

126/ That program 2 could be described as a program to be used when a listener would like to

have background noises somewhat reduced, and;

127/ That program 3 would provide a higher level of background sound reduction, and;

128/ That the hearing aid has an additional function programmed into the hearing aid enabling

use of an accessory FM Looping device as an automatic function when switched on Program 2,

and;

129/ That this FM looping system is a separate device worn around Plaintiff' neck, with an

FM antenna used as a loop around Plaintiff neck that holds the device in place, and;

130/ That the FM looping system enables Plaintiff to use an FM loop device that greatly

increases the level of sound provided to Plaintiff, and;

131/ That Plaintiff uses an FM looping system called Comfort Contego which is manufactured

by Phonak, a hearing aid manufacturer, and;

132/    That Plaintiff uses this system when he needs a boosted sound level above what his hearing aids are able to produce, and;

133/    That Plaintiff wears a Comfort Contego R900 receiver around his neck, and uses a remote transmitted to pick up sound and transmit it to the R900 receiver, and;

134/    That after buying the truck in question, Plaintiff began to notice what can best be described as a buzzing or humming sound coming from the truck at what seemed at the time to be random occurrences, and;

135/    That Plaintiff has since determined when the engine of the truck is in operation and the throttle is engaged, and Plaintiff is in program 2 on his hearing aid, Plaintiff hears humming or buzzing sound that is keyed somehow to the gas peddle of the truck being depressed, and;

136/    That this always occurs when Plaintiff is wearing the hearing aid with it set in program 2, regardless of whether Plaintiff is actually wearing the FM loop device, and;

137/    That Plaintiff took the truck in for service when the truck had 11,154 miles driven (Exhibit A, Vehicle Service Records, 45 pages, at page 10), and;

138/    That Plaintiff was complaining about a "whining noise" coming from the front area of the truck, and;

139/    That Defendant Ford was not able to determine what that noise was, and;

140/    That Plaintiff took the truck to the dealership on May 21, 2022 when the truck was at 27,433 miles complaining about a "humming noise" that comes and goes on the truck, and;

141/    That Defendant Ford advised they were unable to duplicate at that time (Exhibit A, Vehicle Service Records, 45 pages, at page 23), and;

142/   That as Plaintiff continued to the the truck to the dealership for repairs, this issue

continued to be an annoying problem for Plaintiff, and at one point, Plaintiff was at the

dealership and speaking with Defendant Ford's Agent Bailey, and;

143/   That Plaintiff asked Agent Bailey if he could hear the buzzing sound from the engine and

Agent Bailey advise the could not hear any noise, and;

144/   That Plaintiff expressed surprise that Agent Bailey could not hear the sound as it was

very loud for Plaintiff, and;

145/   That Agent Bailey again assured Plaintiff he could not hear anything and that there was

no audible noise he could hear, and;

146/   That Plaintiff took out his hearing and put in a backup hearing aid which does not have

an FM Loop function, and discovered there was no noise present, and;

147/   That Plaintiff put his regular hearing aid back in and the buzzing noise was back, and it

was at this point that Plaintiff realized the truck engine was somehow creating this artificial

sound or noise in Plaintiff's hearing aid, and;

148/   That Plaintiff told Agent Bailey that the truck engine was interfering with Plaintiff's

hearing aid, however, this fact was not documented in the service records for this vehicle, and;

149/   That Plaintiff sent a notice to a Ford customer service representative about this issue, and;

150/   That Plaintiff discussed this issue with Defendant Company's agent, Lynn Arledge and;

151/   That Plaintiff complained about the truck interring with Plaintiff's hearing aid, and

Defendant Company's Agent Lynn Arledge advised Plaintiff via email on June 18, 2021 that this

issue would be investigated and Agent Arledge would get back with Plaintiff after doing

additional research on this issue, and;

152/    That Agent Arledge did not respond with any additional information after this point in time, and;

153/    That this problem has continued to exist, and has developed into a frustrating problem over time, and;

154/    That Plaintiff now realizes that he had this same problem with the last F250 diesel truck Plaintiff owned which was approximately 20 years ago, and;

155/    That on multiple occasions Plaintiff has been forced to rent trucks at both Home Depot and U-Haul in order to have a truck that was needed for various reasons, and;

156/    That Plaintiff has had times where the vehicle needed to be repaired, and had to be left at Defendant Ford's dealership only to find that no rental vehicle was available, leaving Plaintiff without transportation, and;

157/    That Plaintiff has incurred actual damages which Plaintiff is unable to estimate at this time, and;

158/    That Plaintiff has lost use of the vehicle which has prevented Plaintiff from earning income with this vehicle, and;

159/    That on June 22, 2022, Plaintiff was driving on the freeway at approximately 70 MPH and began hearing sounds coming from the mechanical drive train of the vehicle, and shortly thereafter, warning notices begin popping on the dashboard of the truck reading "Transmission Not in Park" with an option given on the display screen select "OK", and;

160/     That on June 30, 2022 while sitting at a red light idling, this same error message popped

up on the dashboard of the truck, however was not there long enough for Plaintiff to take a photo

of it, and;

161/     That as of July 25, 2022, Defendant Company's website at "https://www.ford.com/trucks/

super-duty/features/durability/" states the Ford F250 is "Built For Strength. Built To Last", and;

162/     That as of July 25, 2022, Defendant Company is marketing this model of Ford truck as a

"Super Duty" truck, and;

163/     That as of July 25, 2022, this same website advises this truck is "Built Ford Tough", and;

164/     That as of July 25, 2022, this same website advises asserts to potential customers that

Defendant Company "…has produced America's premier line of rugged and dependable pickups

for 44 straight years…", and;

165/     That as of July 25, 2022, this same website advertises the F250 model of Ford truck as

being "more dent-and-ding resistant than other Full Size Pickups over 8,500 lbs. GVWR, and;

166/     That as of July 25, 2022, this same website advertises this model of truck as having more

than 20 million miles of testing, and;

167/     That  as of July 25, 2022, this same website advises potential buyers that "such extreme

conditions went far beyond what you would likely encounter on your toughest of jobs," and;

168/     That when Plaintiff purchased this truck he specifically asked his Sales Representative if

there were any quality control problems with Ford vehicles and was told emphatically that Ford

has no quality control problems or issues the Sales representative was aware of, and;

169/     That Plaintiff spoke with various other Sales staff at this dealership and everyone

expressed the same option; that Ford trucks have no quality control problems, and;

**FURTHER SAYETH YOUR AFFIANT NAUGHT.**

August 8, 2022

_____

Thomas Brown
Plaintiff *pro-se*

## VERIFICATION

**STATE OF TEXAS )**
                **( s.s. of Thomas Brown**
**County of Harris,   )**

       BEFORE ME, the undersigned notary, personally appeared Thomas Brown, the affiant, who's identity is known to me. After I administered an oath, affiant testified as follows: "My name is Thomas Brown. I am capable of making this verification. I have read the foregoing STATEMENT OF FACTS, and verify these statements are true and correct to the best of my knowledge and belief."

_____

Thomas Brown
Affiant

      SWORN AND SUBSCRIBED TO before me on this 8th day of August, 2022.

> JALEN WILLIAMS
> Notary Public, State of Texas
> Comm. Expires 06-14-2026
> Notary ID 133810857

_____

Notary Public, in and for
The State of Texas

My Comm. Expires: _6 / 14 / 2026_

## **CAUSE OF ACTION**

170/   Plaintiff is a consumer under the Deceptive Trade Practices Act, hereinafter D.T.P.A.,

because Plaintiff is an individual who acquired goods and services by purchase.

171/   Defendant Ford Motor Company is a corporation that can be sued under the D.T.P.A.

Defendant Russell and Smith Ford is a corporation that can be sued under the D.T.P.A.

Defendant Michael G. Smith is an individual that can be sued under the D.T.P.A.

172/   Defendants violated the D.T.P.A. when Defendants engaged in false, misleading, or

deceptive acts that Plaintiff relied on to Plaintiff's detriment. Defendants represented that the

vehicle purchased by Plaintiff had characteristics, or qualities the vehicle does not have. Tex.

Bus. & Com. Code§ 1 7.46(b)(5).

173/   Plaintiff's truck has repeatedly had system failures of various components of the truck.

This includes the plastic parts on the running board on each side of the truck falling off; the

plastic cover on the tailgate which was designed to be used as a step being damaged from

stepping on it, and now at the point where it's permanently damaged and unattached; the front

-end brakes failing requiring replacement of the braking system components; the electronics in

the truck not working correctly and failing repeatedly; the transmission failing; the mechanical

components of the tailgate of the truck bed failing to the point where the truck's tailgate

mechanical function will not operate correctly and release the fold down step.

174/   These failures have resulted in Plaintiff being forced to leave the truck at Defendant

Ford's dealership to be repaired over, and over, and over.  In some of these instances, Plaintiff

has been forced to rent a truck needed to perform a truck-function while Plaintiff's truck was being repaired.

175/    That happened specifically and repeatedly with the navigation system in the truck.  This happened specifically and repeatedly with the 4G hotspot in the truck. This happened specifically and repeatedly with the radio or Sirius components in the truck.

176/    There were occurrences where the electronic system in the truck would be malfunctioning off and on, and Plaintiff would inquire at the dealership what to do about this, only to be told that if the system was not malfunctioning went it was checked, nothing could be done to fix the problem.

177/    There were repeated occurrences where Plaintiff would drop off the truck with the electronics in the truck malfunctioning, only to find out that nothing had been repaired and the truck was still malfunctioning the same way it was before the truck was dropped off for service.

178/    The issues with the navigation system in the truck were well documented in the period of time when there was a bumper to bumper warranty on the truck. Plaintiff complained about the problems with this system over and over, and when Plaintiff served a notice of a claim for violations of the D.T.P.A. this issue was listed in that document.

179/    At a point in time after the bumper to bumper warranty expired, Plaintiff had once again again brought the vehicle to Defendant Ford's dealership over the electronics problem. At that point, Defendants replaced some components in this system. After the repairs had been completed and Plaintiff came to pick up the truck, Plaintiff was advised by Agent Bailey that the factory bumper to bumper warranty had expired and Plaintiff had to pay for the repair if Plaintiff

wanted to pick up the truck from the dealership. Plaintiff had no choice but to pay the fees as the truck would not be released until the repairs were paid for.

180/   At one point during the time frame when Plaintiff was complaining about the truck not being repaired, Defendant's agent specifically stated to Plaintiff they could not fix the ongoing problems with the electronics in Plaintiff's truck.

181/   At one point, Defendants Ford and Smith placed a hold on their Ford dealership being able to service Plaintiff's vehicle. Plaintiff had taken the truck to Defendant Ford's dealership for service or repair, and Agent Bailey the service check-in representative specifically told Plaintiff he could not check in vehicle for service because there was a service hold in place.

182/   Agent Bailey escorted Plaintiff to the office of Agent Worsham, and Plaintiff stood there in the office doorway while Agent Worsham sat at his desk, pretending to check on his computer to see if any lawsuit had been filed against Defendants.

183/   This was done in an effort to intimidate and coerce Plaintiff into accepting the problems with the truck out of fear Defendants would not service the vehicle if a suit had been filed. This has caused Plaintiff to suffer extended periods of stress, and anxiety, and even today, Plaintiff is left in a state of stress over this vehicle and does not know whether Defendants, or other Ford dealerships will continue to service Plaintiff's vehicle after this suit is filed.

184/   At a point in time shortly after the vehicle was purchased, Plaintiff began to complain to Defendant Ford that the transmission was malfunctioning, not shifting correctly, and was making mechanical, grinding noises indicating it had a problem. An agent of Defendant Ford and Defendant Smith told Plaintiff if the transmission problem did not occur during a test drive, they would not try to diagnose the issue.

185/    That happened on multiple occasions, being the standard response Defendant Ford had with various problems in the truck.

186/    At one point, the transmission failed, and Plaintiff had the vehicle towed to Defendant Ford's dealership for repair. The vehicle sat at Defendant Ford's dealership for 79 days before it was returned. It took more than 60 days before the vehicle could even be checked to determine why the transmission had stopped working.  At the time the vehicle was checked in, Plaintiff was advised by Agent Bailey there was a backlog of vehicles needing transmission repairs and that Plaintiff had to wait in line for his turn.

187/    That in the month of May 2022, Defendant Company issued a service recall titled "Safety Recall Notice 22S22 / NHTSA Recall 22V256".   This recall had to do with the transmission having a potential for failure and requiring specific repairs to prevent that failure.

188/    On or about May 25, 2022,  Plaintiff was contacted by Agent Bailey and advised that the truck had a new transmission installed and that Plaintiff could come and pick up the truck.

189/    When Plaintiff picked up the truck, he asked Agent Bailey if the required modifications had been made to the transmission in reference to the transmission recall that had just come out. Agent Bailey responded that the parts were not available and it was unknown when the parts would be available.

190/    On the service ticket for the repairs of the truck that was provided to Plaintiff when the vehicle was picked up, Defendants Ford and Smith's agent had written into the service record that Plaintiff was notified, and is unable to have the repairs done and will reschedule in the future.  Plaintiff had never spoken with anyone from Defendant Ford about this recall until he asked as he asked about it as he was picking up his truck.

191/ One should note the service records provided show there were chunks of metal in the transmission oil pan when the transmission was finally pulled and inspected. These chunks of metal could have discovered earlier if Defendants wanted do so however, the policy of holding off on repairs until system failure prevented this from happening .

192/ It's telling that the record does not document that fact that Defendant Ford does not have the parts available for the needed repairs. The record instead creates a false narrative, stating that Plaintiff is unable to have the repairs done. It is unknown whether this is a coordinated effort by Defendant Company to create a false record, or whether this is just the service technician stating randomly stating whatever they wish to state. This can only be determined during the discovery process through requests for production and depositions.

193/ At present, Plaintiff is unable to get a complete set of service records for the truck. Agent McNulty with Defendant Ford advised Plaintiff that they changed their computer system and all of the historical information on the original service records did not transfer over when Defendant Ford decided to change their computer system. For the reason, Plaintiff is unable to determine the dates for the repairs that have been needed.

194/ The truck in question has had repeated quality control issues requiring Plaintiff to leave the truck at the dealership where it was purchased for repairs leaving Plaintiff without transportation, and without the heavy duty truck Plaintiff purchased and that Plaintiff needs for various reasons and various uses.

195/ Plaintiff gave Defendant notice as required by the Texas Business & Commerce Code, §17.505(a) claiming Defendant has violated Deceptive Trade Practices Act. Plaintiff hereby incorporates said notice by its reference, as if set forth in full at this point.

196/  Defendants violated the factory bumper to bumper warranty that comes with all vehicles manufactured and sold by Defendant Company. Plaintiff was a consumer, the warranty was an express warranty, the warranty was breached, and the breach was a producing cause of Plaintiff's damages.

197/  Despite Plaintiff repeatedly complaining about the electronics in this truck, Defendants waited until the factory bumper to bumper warranty had expired before undertaking a repair, and then forced Plaintiff to pay for the repair. This happened one more than one occasion, and is a pattern of operation Defendants follow.

198/  Defendants know that any repair undertaken on a vehicle when that vehicle has the bumper to bumper warranty in place means that all costs of the repair, including the cost for a rental vehicle would fall on Defendants. For this reason, Defendants do everything possible to avoid working on any problem during the bumper to bumper warranty period. Plaintiff brought the truck in with ongoing problems on multiple occurrences, and Defendant Ford refused to even attempt to diagnose the problems.

199/  Essentially the same thing for the transmission in the truck. Plaintiff complained about transmission problems in the truck on multiple occasions only to be told that nothing would be done unless and until the transmission either manifested the problem when it was being checked by Defendants, or until the transmission failed.

200/  Defendants refused to make any effort to investigate the problems with the transmission forcing Plaintiff to wait until the transmission failed, forcing Plaintiff to suffer the consequences of that failure.

201/   It's true that Defendant's paid for fixing the transmission however, initially would not pay for the rental car for Plaintiff. Defendant's covered the cost of a rental car after Plaintiff complained however, a rental truck was not available and could not be provided. Plaintiff was forced to rent a truck elsewhere.

202/   Defendant's placed a transmission into Plaintiff's truck knowing a repair recall was in place on that exact transmission which requires a specific set of repairs. Defendant Ford installed the transmission knowing Plaintiff will again be forced to give up the truck for this repair at a future date.

203/   Despite a new transmission being placed into Plaintiff's truck, there continues to be display messages popping up on the in-dash monitor of the truck indicating issues with the electronics and transmission in this truck.

204/   Defendant's wrongful conduct was a producing cause of Plaintiff's injury, which resulted in economic damages, and mental anguish damages. Plaintiff seeks damages within the jurisdictional limits of the Court.

205/   <u>Mental-anguish damages</u>. Defendant acted knowingly and intentionally, which entitles Plaintiff to recover mental-anguish damages under Texas Business and Commerce Code Section 17.50(b)(1). Plaintiff seeks treble economic damages Texas Business and Commerce Code Section 17.50(b)(1).

206/   Defendant markets the Ford F-Series pickup trucks as being high quality vehicles when the fact of the matter is Defendant knowingly sells these types of trucks trimmed with cheap plastic parts that will start falling off at some point and this problem cannot be discovered until after the truck has been is use for a period of time. Defendants have ongoing quality control

problems with the trucks, leaving those whom purchase these vehicles to deal with these problems, and the impacts they have.

207/  Defendant Company has a policy in place for all vehicles which have a factory bumper to bumper warranty to limit resources used to examine and check such vehicles unless the vehicle actually fails to function. Doing so saves money and expense for all Defendants, and places those costs and resultant burden on Plaintiff.

208/  Plaintiff seeks unliquidated damages in the amount of at least $250,000 which is within the jurisdictional limits of this Court.

209/  Plaintiff alleges Defendants, acting in concert, manipulate the factual record for problems with Ford vehicles in an effort to prevent buyers from knowing these problems exist. When these vehicles are being sold at various dealerships, these vehicles are being marketed as having no quality control issues while at the same time Defendants dealership service bays are full of vehicles manifesting those problems.  When they create documents that outline service problems, the wording describing the repairs are phrased in a way to prevent the creation of a factual records documenting the problems with Ford vehicles.

210/  Defendant's sell Ford vehicles to buyers and when there is a problem with the vehicle that require parts for repair, Defendants assert that no parts are available when the fact of the matter is parts are readily available however, they're being intentionally held in reserve for the manufacturer to use in the production of new vehicles.

211/  Plaintiff has dropped off the truck for repairs at Defendant Ford, and Defendant Ford takes no action to repair the truck under warranty, pushing the repair of the problem out until the bumper to bumper warranty has expired, pushing those repairs costs out to Plaintiff.

212/    Plaintiff advised Defendant Ford on multiple occasions that the transmission in the truck was making mechanical, grinding noises that sounded like the transmission was failing and Defendants would not even inspect the issue, forcing Plaintiff to want until he is stranded without transportation because the transmission has failed.

213/    When Plaintiff raised the issues with this truck to Defendants, Defendant Ford plays games with Plaintiff, forcing him to stand around and wait while Defendant's agent checks his computer supposedly to make sure Plaintiff has not filed a lawsuit. All of this was done with the intent to coerce Plaintiff into accepting the problems with the truck for fear that Defendant's will stop servicing the truck if Plaintiff were to pursue litigation to hold Defendants accountable for the problems with this vehicle.

214/    In the future, Plaintiff intends to turn this matter over to counsel for a trial on the merits. In that instance, Plaintiff is entitled to an award to recover reasonable and necessary attorney fees for prosecuting this suit under Texas and Business Commerce Code section 17.50(d). Plaintiff will recover damages on this cause and in the premises, such an award would be warranted.

215/    Plaintiff will seek to recover prejudgment and postjudgment interest under Texas and Business Commerce Code section 17.50(f).

216/    The facts to further support the allegations in this pleading will be discovered in the course of this litigation, and Plaintiff will amend these pleadings as and when such facts are available.

## EQUITABLE RELIEF

Plaintiff seeks equitable relief in the from of a declaratory judgement that each of the

Defendants employee business practices that are deceptive and violate the Texas Deceptive Trade

Practices Act.

## JURY DEMAND

Plaintiff demands a jury trial and tenders the appropriate fee, as may be required with this

petition.

## CONDITIONS PRECEDENT

All conditions precedent to Plaintiff's claim for relief have been performed or have

occurred.

## REQUEST FOR DISCLOSURE

Under T.R.C.P. Rule 194, Plaintiff requests Defendants each disclose, within 50 days of

service of this request, the information or material described in Rule 194.2.

## OBJECTION TO ASSOCIATE JUDGE

Plaintiff hereby objects to the referral of this case to an Associate Judge or Magistrate.

## PRAYER

For these reasons, Plaintiff asks the Court to issue citation for  Defendants to appear and

answer, and that Plaintiff be awarded a judgment against Defendants for the following:

a.   Economic damages

b.   Treble damages

c.   Declaratory judgement

d.   Court costs

e.      Attorney fees, as deemed appropriate

f.      All other and further relief to which Plaintiff is entitled in the premises.

DATED this 8th day of August, 2022.

RESPECTFULLY SUMBITTED

Thomas Brown
11715 Forest Wind Lane
Houston, Texas 77066
thomaslenbrown@gmail.com
281-235-4131

PLAINTIFF *PRO-SE*

## PLAINTIFF'S INITIAL DISCLOSURES

Plaintiff whereby provide his initial disclosures pursuant to T.R.C.P., Rule 26:

**(i)** the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

**DISCLOSURE:**
Plaintiff is not aware at this time of any individual that can provide additional information to support Plaintiff claims. Plaintiff will update this disclosure if and when additional information becomes available or known.

**(ii)** a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

**DISCLOSURE:**

Plaintiff is not aware at this time of any documents, electronically stored information, or other tangible thing(s) that can provide additional information to support Plaintiff claims. Plaintiff will update this disclosure if and when additional information becomes available or known.

(**iii**) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

**DISCLOSURE:**
Plaintiff will update this disclosure if and when additional information becomes available or known.

(**iv**) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**DISCLOSURE:**
Plaintiff is not aware of any insurance agreement whereby an insurance business would be liable for any judgement rendered in this action.

August 8, 2022

Thomas Brown
Plaintiff *pro-se*